UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

KARL NIEDERMAIER,

Plaintiff,

v.

SOUTHERN TIER BUILDING TRADES
BENEFIT PLAN, JOINT BOARD OF
TRUSTEES OF THE SOUTHERN TIER
BUILDING TRADES BENEFIT PLAN

Defendants.

---

**DECISION AND ORDER**
12-CV-06448 EAW

## INTRODUCTION

Plaintiff Karl Niedermaier ("Plaintiff") is a natural gas pipeline superintendent who is eligible for health benefits coverage under the Southern Tier Building Trades Plan (the "Plan"). Plaintiff has a long history of bilateral hearing loss. In 2011, he received a cochlear implant at the University of Rochester Medical Center ("URMC"). The Plan, through Defendant the Joint Board of Trustees of the Southern Tier Building Trades Benefit Plan (the "Board"), denied his requests for coverage for his cochlear implant surgery, the cochlear implant device, and related treatment. Plaintiff appealed this decision twice; both his appeals were denied. Plaintiff commenced the instant action pursuant to the Employee Retirement Income Security Act ("ERISA"), specifically

29 U.S.C. § 1132(a)(1)(B), seeking to recover benefits he claims were due to him under the Plan.

Both Plaintiff and Defendants have moved for summary judgment. (Dkt. 25, 26). Based on the record before the Court, the Board reasonably concluded that Plaintiff's cochlear implant expenses were not covered under the Plan due to the "artificial implant" exclusion. As a result, Plaintiff's motion for summary judgment is denied and Defendants' motion for summary judgment is granted.

## BACKGROUND

Plaintiff is a member of the Laborer's International Union of North America 621 and is eligible for health benefits coverage through the Plan. (Dkt. 26-5 at ¶ 2; Dkt. 28-3 at 1). Plaintiff has suffered from serious hearing loss since birth. As of 2010, even high powered hearing aids were unable to provide him with adequate access to sound. (Dkt. 26-5 at ¶ 3). In 2011, his physician, Dr. John Wayman, and his audiologist determined that Plaintiff would be a good candidate for a cochlear implant. (*Id*. at ¶ 4). A cochlear implant is a small electronic device that "can help provide a sense of sound to a person who is profoundly deaf or severely hard-of-hearing. The implant consists of an external portion that sits behind the ear and a second portion that is surgically placed under the skin. . . ." (Dkt. 26-1, Ex. A; Dkt. 28-3 at 3).

Jennifer Resch, a secretary at University Otolaryngology Associates, states that she spoke to an individual named Cassandra who was employed by the Plan on or about

April 26, 2011, and was told that placement of the cochlear implant would be covered and that no precertification was necessary. (Dkt. 26-8 at ¶ 3). Defendants dispute this and state that on February 18, 2011, Plaintiff's wife called the Plan office to ask about coverage for hearing related claims and was told that hearing related claims were not covered; on March 20, 2011, the Plan rejected Plaintiff's claim for the cost of a comprehensive audiometry threshold evaluation on the basis that it was not covered; on May 31, 2011, Plaintiff's wife called the Plan office saying that Plaintiff needed hearing surgery, and on that same day, doctor's notes were faxed to the Plan office for consideration; on June 10, 2011, a representative from Strong Memorial Hospital's Financial Counseling Office, Mr. Monzzell, called the Plan office to ask questions about Plaintiff's case and was told that the surgery was not covered. (Dkt. 25-3 at ¶ 16).

On June 13, 2011, Dr. Wayman performed surgery on Plaintiff to place the internal portion of the cochlear implant. (Dkt. 26-5 at ¶ 6; Dkt. 28-3 at 5). On June 27, 2011, the Plan sent Plaintiff a letter denying his claim for the June 13, 2011, surgery. (Dkt. 26-5, Ex. B). The denial letter stated that the medical expenses related to the surgery were not covered because the Plan, in Section 3.10, contains exclusions for expenses related to: (1) "surgery, treatment and services for artificial implants, except in connection with reconstructive surgery following a mastectomy"; and (2) "hearing aids and hearing exams." (*Id.*). The denial letter further informed Plaintiff that although the medical expenses related to his cochlear implant surgery were not covered under the

insurance provisions of the Plan, they were reimbursable from Plaintiff's medical reimbursement account, up to the amount in the account. (*Id.*).

On July 7, 2011, and July 8, 2011, URMC and University Otolaryngology Associates ("UOA") submitted letters to the Plan stating that they were appealing the denial of the claim on behalf of Plaintiff. (Dkt. 25-3 at ¶ 10). The July 7, 2011, letter was from audiologist Christy Hopson, Director of Clinical Services for URMC Audiology, who explained that a cochlear implant is not a hearing aid, and that it consists of two essential parts: "a surgically implanted internal device and an external sound processor that converts acoustic sound into electronic impulses transmitted through the skin to the internal device which then electrically stimulates the auditory nerve." (Dkt. 25-4 at 117). Ms. Hopson also included Plaintiff's audiology records. The July 8, 2011, letter from UOA also included medical records and a letter from Dr. Wayman stating that the cochlear implantation was medically necessary for Plaintiff to continue to function in his job. (*Id.* at 120-132). On July 15, 2011, an insurance collection specialist from URMC sent another letter to the Plan requesting that the letter be considered an official appeal of the denial of Plaintiff's claim. (*Id.* at 134).

On August 19, 2011, the Plan (via Ellie Munson, the Fund Office Administrator) sent a letter to Plaintiff stating that they had received the letters from URMC and UOA and that they would consider the correspondence to be an appeal filed directly by Plaintiff. (*Id.* at 137). The Plan's letter explained that the correspondence from URMC

and UOA was primarily addressed to whether the surgery was medically necessary, and that Plaintiff's claim had not been denied on that basis.   The August 19, 2011, letter further stated that "[t]he Board of Trustees believes that a cochlear implant is an 'implant' within the common meaning of that term (i.e. something that is placed, usually surgically, within a living body, such as a medical device).   Furthermore, although a cochlear implant is not a traditional hearing aid, it is clearly a device implanted for the purpose of aiding a person to hear. . . ." (*Id.* at 138).

On October 5, 2011, Plaintiff sent a letter to the Board and Ms. Munson labeled "Personal Appeal" in which he again requested that the Board reverse its decision. (*Id.* at 141).   Plaintiff questioned the Board's interpretation of "artificial implant," asking whether it would also extend to pacemakers and surgical screws and pins.   Plaintiff explained that "[t]o [him], artificial implant implies images of breast implants, chin implants, and all that is cosmetic.   The cochlear [implant] is simply implanted into my head closest to my ear and does not make me beautiful." (*Id.*)   Plaintiff also argued that the cochlear implant was not a hearing aid because "[y]ou cannot aide hearing if there is no hearing to begin with." (*Id.*)

On October 26, 2011, Ms. Munson, on behalf of the Plan, sent a letter to Plaintiff denying his personal appeal.   (Dkt. 25-4 at 143-45).   The letter explained that even though the Plan allows only one internal appeal of a denied claim, the Board had considered his personal appeal because he never filed written confirmation that URMC

and UOA were authorized to file an appeal on his behalf. (*Id.* at 143). The letter further explained that although Plaintiff claimed he had been led to believe his surgery would be covered, the Plan's records did not bear this out. (*Id.* at 144). Finally, the letter explained that the Board had affirmed the denial of Plaintiff's claim for the reasons set forth in the August 19, 2011, letter. (*Id.* at 145).

Plaintiff commenced the instant action on June 22, 2012. (Dkt. 1). Discovery closed on March 29, 2013. (Dkt. 22). The parties filed their competing motions for summary judgment on June 25, 2013. (Dkt. 25, 26). The parties filed their responses to each other's motions on July 26, 2013. (Dkt. 28, 29). Reply papers were filed on August 9, 2013, and August 12, 2013. (Dkt. 30, 31). The case was reassigned to the undersigned on February 21, 2014, without a decision having been rendered on the pending motions. (Dkt. 32). Oral argument on the instant motions was held on May 28, 2014. (Dkt. 36).

## DISCUSSION

### I.    Legal Standard

All parties have moved for summary judgment, urging the Court to adopt their competing interpretations of the relevant provisions of the Plan. The parties agree that the Court should interpret the relevant provisions of the Plan and neither party takes the position that issues of fact preclude entry of judgment at this time. "In interpreting an ERISA plan, the court examines the plan documents as a whole and, if unambiguous, construes them as a matter of law." *Admin. Comm. of the Wal-Mart Associates Health*

*and Welfare Plan v. Willard*, 393 F.3d 1119, 1123 (10th Cir. 2004); *see also Lifson v.*
*INA Life Ins. Co. of N.Y*, 333 F.3d 349, 353 (2d Cir. 2003) ("We apply familiar rules of
contract interpretation in reading an ERISA plan. . . . [The] Court reads [the] plan as a
whole, giving priority to [the] plain meaning of its terms.").

ERISA "does not regulate the substantive content of welfare-benefit plans."
*Metro. Life Ins. Co. v. Mass.*, 471 U.S. 724, 732 (1985).   As a result, "employers have
large leeway to design disability and other welfare plans as they see fit." *Black & Decker*
*Disability Plan v. Nord*, 538 U.S. 822, 833 (2003).   Therefore, on review of an ERISA
claim, the Court's consideration is limited to determining whether the plan administrator
properly construed the terms of the plan. *See id.*

"[A] denial of benefits challenged under [ERISA] is to be reviewed under a *de*
*novo* standard unless the benefit plan gives the administrator or fiduciary discretionary
authority to determine eligibility for benefits or to construe the terms of the plan."
*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  Where the benefit plan
gives the administrator discretionary authority to construe the terms of the plan, "denials
may be overturned as arbitrary and capricious only if the decision is without reason,
unsupported by substantial evidence or erroneous as a matter of law." *Fay v. Oxford*
*Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002) (quotation omitted); *see also Pagan v.*
*NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995) ("[W]e are not free to substitute
our own judgment for that of the [plan administrator] as if we were considering the issue

of eligibility anew."). "[A] district court's review under the arbitrary and capricious standard is limited to the administrative record." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995).

Here, both parties agree that the appropriate standard of review is the deferential "arbitrary and capricious" standard. (*See* Dkt. 25-5 at 11-12; Dkt 26-10 at 8). The parties disagree, however, about whether the plan administrator in this case (i.e. the Board) had a conflict of interest that would impact the standard of review.

The United States Supreme Court has held that where the entity that administers an ERISA plan both determines whether an employee is eligible for benefits and pays benefits out of its own pocket, a conflict of interest is created and a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits, with the significance of the factor depending upon the circumstances of the particular case. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008); *see also McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 132 (2d Cir. 2008).

Here, Plaintiff argues that the Board had a conflict of interest because the Plan is sponsored by four unions and an employer organization, the Board normally consists of one trustee appointed by each of the unions and an equal number appointed by the employer association, and the Plan is funded by the employers. (Dkt. 26-10 at 9). As

-8-

such, Plaintiff argues, "[e]valuation of claims under the Plan is entrusted, at least in part, to representatives of the employers who ultimately pay claims." (*Id.*).

"[T]he joint administration of a benefit plan by both employer appointees and union appointees creates a conflict of interest of which a court should take notice when conducting its review." *Zarringhalam v. United Food & Commercial Workers Int'l Union Local 1500 Welfare Fund*, 906 F. Supp. 2d 140, 157-58 (E.D.N.Y. 2012). However, "[t]he weight properly accorded a . . . conflict varies in direct proportion to the 'likelihood that [the conflict] affected the benefits decision. . . .'" *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 139 (2d Cir. 2010) (quoting *Glenn*, 554 U.S. at 118).

In this case, Plaintiff has not presented any evidence of biased claims decisions by the Board, nor any other evidence that the Board's conflict of interest actually impacted the benefits decision. Instead, Plaintiff essentially argues that the Board's decision is itself evidence of bias because it is unreasonable and arbitrary on its face, and that the Board ignored the evidence provided by its own benefits consultant.

Plaintiff's argument conflates the conflict of interest issue with the merits of the case. In other words, Plaintiff cannot raise a genuine issue of material fact that the conflict affected the benefits decision by simply relying on the fact that the decision was unfavorable to Plaintiff. Moreover, there is no indication in the record that the Board ignored the evidence provided by the benefits consultant. That evidence addressed

whether other plans covered cochlear implants, but it was ultimately not determinative on the dispositive issue(s) of whether a cochlear implant is either an "artificial implant" or a "hearing aid" within the meaning of the Plan at issue in this case.

Because Plaintiff has failed to present evidence that the Board was influenced by a conflict of interest in making its determination, little weight should be given to the fact that some of the Board members represent the employers who ultimately pay the claims. *See Zarringhalam*, 906 F. Supp. 2d at 158 (giving little weight to conflict of interest where "there is no evidence in the record, nor does the plaintiff direct the Court to such, raising a genuine issue of material fact as to whether the [plan administrator] historically made biased decisions, or whether its actions were deceptive, unreasonable, or tainted by a conflict of interest. Moreover, the Board consists of an equal number of both union and employer representatives with the same power and responsibilities, serving to abate any possible conflicts."). Accordingly, the Court takes note of the conflict of interest identified by Plaintiff, but as discussed below, Plaintiff fails to demonstrate that the Board's denial of coverage was arbitrary and capricious. The presence of employer representatives on the Board does not alter that conclusion.

## II.   Denial of Coverage for Plaintiff's Cochlear Implant

### A.   Procedural Irregularities

As a threshold matter, Plaintiff argues that Defendants' denial of his appeals must be reversed for failure to comply with the procedural requirements of the Plan. In

particular, Plaintiff argues that the Board: (1) did not take into account all documents, records, and information submitted by Plaintiff; (2) failed to have the review conducted by "an appropriate named fiduciary who did not make the initial determination and who is not a subordinate of the person who did" (Dkt. 26-6 at 42); and (3) did not, for a claim based on medical judgment, consult with a licensed or certified independent health professional.  (Dkt. 26-10 at 14-15).

Defendants counter: (1) there is no evidence that the Board failed to take into account all the documents, records, and information submitted by Plaintiff; (2) the initial denial of the claim was made by Ms. Munson, while both appeals were reviewed by the entirety of the Board; and (3) the claim was not based on medical judgment, but on plan interpretation.  (Dkt. 28 at 16-17).  Plaintiff does not address any of these arguments in his reply.

"In addition to weighing the conflict of interest, procedural irregularities in the administrative process also constitute factors that should be taken into consideration in determining whether a plan administrator abused its discretion in denying a claimant's claim for benefits under the ERISA plan." *Diamond v. Reliance Standard Life Ins.*, 672 F. Supp. 2d 530, 535 (S.D.N.Y. 2009).  Thus, if the Court were to find that there were procedural irregularities in this case, the Court would take those irregularities into account in deciding the competing motions for summary judgment.  However, Plaintiff has not presented evidence of any procedural irregularities.

As to the first issue raised by Plaintiff, the Plan's August 19, 2011, letter specifically states that the Board has reviewed and considered the correspondence and attachments from both URMC and UOA. (Dkt. 25-4 at 137). Moreover, the August 19, 2011, letter specifically references portions of those documents. (*Id.* at 137-39). Plaintiff's only argument on this point is that the minutes of the Board meeting do not specifically state that all the documents were considered, but Plaintiff has not cited any authority for the proposition that the minutes must state in detail every document that was reviewed. There is simply no evidence in the record that Defendants failed to consider the information provided by URMC and UOA. Moreover, as Defendants correctly point out, that information was overwhelmingly addressed to the issue of medical necessity, which was not the basis for denying Plaintiff's claim.

As to the second point, Defendants have adequately identified who performed the initial review of Plaintiff's claim and who performed the review on appeal. There is no evidence that the same person performed both levels of review or that the Board is subordinate to Ms. Munson. As such, there is no procedural irregularity in this regard.

As to the third point, it is not an issue of "medical judgment" whether a cochlear implant falls under particular plan exclusions; it is an issue of plan interpretation. There is no evidence in the record to support the contention that the Board should have engaged a medical consultant under these circumstances.

As a result, there are no procedural irregularities for the Court to consider in resolving the competing motions for summary judgment.

**B.      Applicability of Plan Exclusions**

The heart of this matter is the parties' disagreement about whether it was reasonable for the Board to conclude that a cochlear implant was either (1) an artificial implant or (2) a hearing aid, and therefore not a "Covered Expense" under the Plan. Plaintiff argues that the cochlear implant should have been covered under the plain language of the Plan and the conclusion that the cochlear implant was excluded from coverage was arbitrary and capricious.

**1.      Plaintiff's Plain Language Argument**

Plaintiff's first argument is that the cochlear implant is covered under the plain language of the Plan.   This argument is based on the fact that the Plan defines a "Covered Expense" as an "expense for a medical service, treatment, device, or supply that qualifies for payment by the Plan . . ."; the fact that the cochlear implant was medically necessary; the fact that the Plan's list of exclusions does not specifically list cochlear implants; and the fact that the Plan specifically includes prosthetics as a "Covered Expense." (Dkt. 26-10 at 10-11). Plaintiff points out that the Plan consulted a benefits consultant, Thomas Flynn, and that he provided information that all the insurers he surveyed covered the cochlear implant, and that cochlear implants are typically considered prosthetics by employers.   (Dkt.  26-1, Ex. F).  Defendants argue in response

that whether "an expense might otherwise be covered or medically necessary . . . is not the only step needed to determine whether there is coverage for such an expense." (Dkt. 28 at 12).

Plaintiff's plain language argument is not determinative of the issues on these competing motions for summary judgment. There is no claim that Plaintiff's cochlear implant was medically unnecessary. Defendants' position has always rested on the claim that the cochlear implant falls into one of the Plan's enumerated exclusions. Plaintiff essentially concedes that the relevant inquiry must include an analysis of the Plan's exclusions, stating in reply that, "there can be no question that coverage for [the cochlear implant] exists, **absent an applicable plan exclusion**." (Dkt. 30 at 3) (emphasis added). The Court cannot resolve the issues in this case simply by looking to the Plan's definition of "Covered Expense" and not also considering the exclusions relied upon by Defendants.

To the extent that Plaintiff argues that that the Plan's exclusions cannot apply to any device that could reasonably be labeled a "prosthetic" because the definition of "Covered Expense" includes prosthetics, this argument is without merit. It is not out of the ordinary for a health plan to first define "covered expenses" and then identify particular exclusions to that definition. *See, e.g., Diagnostic Med. Associates, M.D., P.C. v. N.Y.C. Dist. Council of Carpenters Welfare Fund*, No. 04 CIV.7662(FM), 2006 WL 728486, at *2 (S.D.N.Y. Mar. 21, 2006). Moreover, in this case, the Plan's exclusions

-14-

are clearly intended to exclude at least some prosthetics. For example, breast implants are often considered prosthetics. *See, e.g.,* 21 C.F.R. § 900.2 ("Breast implant means a prosthetic device implanted in the breast."). Yet the artificial implant exclusion in the Plan is unmistakably intended to apply to breast implants unless received "in connection with reconstructive surgery following a mastectomy." (Dkt. 25-4 at 25).

Because Defendants do not contend that the cochlear implant was medically unnecessary or excluded from coverage for any reason other than the two Plan exclusions discussed at length below, Plaintiff's plain language argument is ultimately not determinative of the resolution of the parties' competing motions for summary judgment. In other words, resolution of the competing motions for summary judgment depends on whether the two Plan exclusions discussed below exclude the expenses for which Plaintiff seeks coverage.

### 2.   The "Hearing Aid" Exclusion

As discussed above, Defendants relied on two of the Plan's express exclusions in denying coverage for Plaintiff's cochlear implant – namely, the exclusion for "hearing aids" and the exclusion for "artificial implants." The Court first considers Defendants' claim that the Board properly denied coverage for the cochlear implant because it is a "hearing aid" and is therefore excluded from coverage. Plaintiff argues that there is overwhelming evidence that a cochlear implant is not a hearing aid and that the Board's determination on this point was arbitrary and capricious.

Plaintiff is correct that the evidence overwhelmingly supports the conclusion that a cochlear implant is not a hearing aid. The medical professionals who opined on the issue confirmed this conclusion. (Dkt. 25-4 at 117; Dkt. 26-9 at ¶ 10). Defendants' argument that a cochlear implant is a hearing aid because it is a device that aids in hearing is misplaced. The evidence shows that unlike a hearing aid, which amplifies sound and assists with existing hearing, a cochlear implant replaces existing hearing pathways and provides an entirely new sensation. *See Poway Unified Sch. Dist. v. K.C. ex rel. Cheng*, No. 10CV897-GPC DHB, 2013 WL 990837, at *2 n.3 (S.D. Cal. Mar. 13, 2013) ("A cochlear implant is an electronic device, part of which is surgically implanted in the head of the deaf individual. Sound is picked up by an external processor, converted to energy and sent into the implanted computer chip. Based on the energy received, the device stimulates the nerves in the inner ear, which then transmit information to the brain. Unlike a hearing aid, the cochlear implant stimulates the ear itself; it does not merely make the sounds louder."). The National Institute of Health's National Institute on Deafness and Communication Disorders has reached the same conclusion, explaining that "[a] cochlear implant is very different from a hearing aid." (Dkt. 26-1, Ex. A).

Moreover, the information provided by Mr. Flynn, Defendants' benefits consultant, confirms that that a cochlear implant is not a hearing aid. For example, the documents provided by CIGNA indicated that a cochlear implant is "an electronic prosthesis" which "may be worn unilaterally with a hearing aid in the contralateral

(opposite) ear," while the documents provided by MVP Healthcare indicated that a cochlear implant was only appropriate in individuals who had limited benefits from hearing aids. (Dkt. 26-1, Ex. F). These documents would make no sense if a cochlear implant was, in fact, a hearing aid.

The decision in *Carolina Care Plan Inc. v. McKenzie*, 467 F.3d 383 (4th Cir. 2006) also supports the conclusion that a cochlear implant is not a hearing aid. In that case, the plan at issue specifically excluded coverage for hearing aids, yet the Fourth Circuit Court of Appeals held that it was "reasonable to infer from [the] omission [of cochlear implants] that the parties did not intend to exclude coverage of cochlear implants." 467 F.3d at 383.

For the foregoing reasons, the Court is not persuaded by Defendants' argument that it was reasonable to deny coverage for Plaintiff's cochlear implant under the Plan's exclusion for hearing aids. Even accepting the Board's assertion that this exception applies not just to traditional hearing aids but to anything that might be said to "aid" hearing, this is not what a cochlear implant does. A cochlear implant bypasses existing hearing entirely and directly stimulates the auditory nerve to create signals in the brain. No reasonable person could conclude that the cochlear implant is a hearing aid in light of this information. The Court therefore declines to uphold the Board's denial of coverage on this basis. However, this does not end the Court's inquiry because Defendants also relied upon the Plan's exclusion for "artificial implants."

### 3.   The "Artificial Implant" Exclusion

Defendants argue that the Board properly determined that the cochlear implant was an "artificial implant" and was thus an excluded expense under the express terms of the Plan.  As discussed above, the Board determined that the appropriate definition of "implant" was "something that is placed, usually surgically, within a living body, such as a medical device." (Dkt. 25-4 at 138).  Plaintiff argues that this definition is improper and overly broad, such that it would include, for example, pacemakers and surgical screws.  Plaintiff further argues that because the cochlear implant has both internal and external components and does not serve a cosmetic purpose, it was unreasonable for the Board to determine that it was an "artificial implant" as that term is used in the Plan.

There is relatively little case law interpreting similar exclusions in the ERISA context.  Plaintiff relies heavily on *Baker v. Tomkins Indus., Inc.*, 339 F. Supp. 2d 1177 (D. Kan. 2004), in which the court found that a cochlear implant did not fall under a plan's exclusion of "body implants of artificial or mechanical devices designed to replace human organs." *Id.* at 1190.  However, the *Baker* court specifically based its decision on the fact that "[d]efendants [did] not explain how a cochlear implant replaces a human organ." *Id.*   Here, the exclusion refers to "artificial implants" generally and is not limited to implants designed to replace human organs.  As such, *Baker* does not squarely address whether a cochlear implant is an "artificial implant."

The Court's own research has revealed one other case specifically addressing cochlear implants and plan exclusions.  In *McKenzie v. Carolina Care Plan, Inc.*, No. CIVA 2:03-2908-12, 2005 WL 6111629 (D.S.C. July 25, 2005), *aff'd sub nom.*, *Carolina Care Plan Inc. v. McKenzie*, 467 F.3d 383 (4th Cir. 2006), the plan at issue contained an exclusion for "comfort or convenience" which included "[d]evices and computers to assist in communication and speech."  *Id.* at *4-5.  The court held that this exclusion did not apply "to something like a cochlear implant which requires the surgical implantation of an artificial part into the body and permits the body to function in a manner in which it otherwise could not."  *Id.* at *5.  As with *Baker,* the resolution in *McKenzie* depended on language different than the terminology at issue here.  In fact, to some extent, *McKenzie* cuts against Plaintiff's position, inasmuch as the court in that case specifically noted that a cochlear implant requires implantation of an artificial part into the body.

Defendants also point out that *The American Heritage Science Dictionary* defines implant as "something implanted, especially a surgically implanted tissue or device," and *The Oxford English Dictionary* defines "implant" as "a thing implanted in something else, especially a piece of tissue, prosthetic devise, or other object implanted in the body." (*See* Dkt. 31 at 7).  It is appropriate to rely on dictionary definitions when interpreting the terms of an ERISA plan.  *See Irion v. Prudential Ins. Co. of Am.,* 964 F.2d 463, 464-65 (5th Cir. 1992) (relying on dictionary definition of "limb" in interpreting a plan provision providing coverage for "artificial limbs, larynxes and eyes.").

-19-

Based on the record in this case, the Court finds that it was not arbitrary and capricious for the Board to determine that a cochlear implant is an "artificial implant." "In a situation '[w]here both the trustees of [an ERISA plan] and a rejected applicant offer rational, though conflicting, interpretations of plan provisions, the trustees' interpretation must be allowed to control.'" *Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003) (quoting *Miles v. New York State Teamsters Conference Pension & Ret. Fund Employee Pension Benefit Plan*, 698 F.2d 593, 601 (2d Cir. 1983)). Here, although Plaintiff has offered evidence that it would have been rational for the Board to conclude that a cochlear implant was not an "artificial implant," it was also rational for the Board to conclude that it was. The definition of an implant includes devices implanted into the body. (*See* Dkt. 31 at 7). Plaintiff's own doctor explained that part of the cochlear implant is an electronic device surgically placed into the body. (Dkt. 26-9 at ¶ 5). Even if only this portion of the device is considered an artificial implant, the associated surgery and the rest of the device are clearly "related to" the internal portion. (*See* Dkt. 25-4 at 24-25 (all expenses "related to" artificial implants are excluded from coverage)).

The fact that other insurers treat a cochlear implant as a prosthetic device is not determinative. Even if the cochlear implant is a prosthesis, "prosthesis" and "implant" are not mutually exclusive terms, as discussed above and evidenced by the fact that *The Oxford English Dictionary* defines "implant" as "a thing implanted in something else,

especially a piece of tissue, **prosthetic device**, or other object implanted in the body."
(Dkt. 31 at 7) (emphasis added).  In other words, even if a cochlear implant is properly
considered a prosthetic device and therefore generally falls within the definition of a
"Covered Expense," it may also be considered an "artificial implant" and therefore
specifically excluded from coverage.

The Board's conclusion is bolstered by the fact that the "artificial implant"
exclusion was amended in 2012 to read "[s]urgery, treatment and services for artificial
implants, except: (i) in connection with reconstructive surgery following a mastectomy;
or (ii) a surgically implanted pacemaker to stimulate or regulate contractions of the heart
muscle."   (Dkt. 25-4 at 47).   As such, and in opposition to Plaintiff's argument, a
pacemaker would apparently otherwise be included in the definition of "artificial
implant" and coverage for such a device would not have been included under the Plan
until the exclusion was amended in 2012.  Notably, the record does not contain any
evidence that the Plan paid medical expenses related to pacemakers prior to this
amendment.

The fact that Plaintiff thinks a cochlear implant should be included in coverage,
and the fact that other insurers and Medicare cover cochlear implants, is ultimately not
dispositive.  ERISA does not dictate the terms of any plan, nor does it require a minimum
level of coverage.  *See Metro. Life Ins. Co. v. Mass.*, 471 U.S. 724, 732 (1985).  ERISA
merely requires that the plan administrator interpret the provisions reasonably.  *See Fay*

*v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002).  Based on the record before the Court, the Board applied a reasonable interpretation of the phrase "artificial implant" in this case, and the Court cannot disturb it.

## III.  Attorneys' Fees

Plaintiff requests an award of attorneys' fees.  Because the Court holds in favor of Defendants on the competing motions for summary judgment, an award of attorneys' fees to Plaintiff is not appropriate in this case.  *See Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 255 (2010) (a party seeking attorneys' fees under ERISA must show "some success on the merits" and "does not satisfy that requirement by achieving 'trivial success on the merits' or a 'purely procedural victor[y]'").  A plaintiff achieves "success on the merits" when he obtains the relief sought by the litigation.  *See Taaffe v. Life Ins. Co. of N. Am.*, 769 F. Supp. 2d 530, 541 (S.D.N.Y. 2011); *see also Scarangella v. Grp. Health, Inc.*, 731 F.3d 146, 155 (2d Cir. 2013) (party may show success on the merits by showing "that judicial action in some way spurred one party to provide another party with relief.").  Here, although the Court agrees with some of Plaintiff's arguments, he ultimately is not entitled to any of the relief sought by his lawsuit and he cannot fairly be said to have achieved "some success on the merits."  *Cf. Taaffe*, 769 F. Supp. 2d 530 at 540-41 (adopting view that a "purely procedural victory" is a victory that "does not bring the victorious party any closer to its desired relief.").

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. 25) is

granted and Plaintiff's motion for summary judgment (Dkt. 26) is denied.  The Clerk of

Court is instructed to enter judgment in Defendants' favor and close the case.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:  October 24, 2014
            Rochester, New York

-23-